**GRUNENTHAL GmbH, a corporation of the Federal Republic of Germany, Plaintiff,**

v.

**Paul HOTZ, Bozena Hotz, Balfour Zepler, Joseph Lowe, Richter Corporation, Ltd., a Bahamian corporation, Cadence Corporation, Ltd., a Bahamian corporation, Productos Gedeon Richter (America) S.A., a Mexico corporation, Defendants.**

**No. 80–590 AWT.**

United States District Court,
C. D. California.

April 8, 1981.

---

Robert L. Lofts, and Thomas G. Wood, Severson, Werson, Berke & Melchior, San Francisco, Cal., for plaintiff.

Robert P. Mallory, Steven J. Miller, Jeffrey S. Benice, Lawler, Felix & Hall, Los Angeles, Cal., for defendant Paul Hotz.

Rex S. Heinke, Gary L. Justice, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendants Productos Gedeon Richter (America) S.A., Richter Corporation Limited, Cadence, Ltd., and Joseph Lowe.

## MEMORANDUM OPINION AND ORDER

TASHIMA, District Judge.

We are required in this case to determine whether Judge Friendly's famous dictum that the anti-fraud provisions of the United States securities laws do not apply "when a German and a Japanese businessman met in New York for convenience, and the latter fraudulently induced the former to make purchases of Japanese securities on the Tokyo Stock Exchange,[1] is, indeed, the law. For the reasons hereinafter stated, we hold that it is and, therefore, that this action must be dismissed.

1. *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1338 (2d Cir. 1972).

*Facts*[2]

■ This action concerns the aborted sale of all of the common stock of defendant Productos Gedeon Richter (America) S.A., a Mexico corporation ("Productos"), to plaintiff Grunenthal GmbH, a corporation of the Federal Republic of Germany ("Grunenthal"). Productos is controlled, through a chain of Bahamian holding companies, by a trust based in the Bahamas. The beneficiary of that trust is defendant Paul Hotz ("Hotz"), a Swiss citizen. Hotz is a resident of Italy, although he is listed in the local telephone directory and is an officer of a California corporation, Alameda Laboratories, Inc. Hotz was in the United States during the period in which the actions complained of took place under a temporary, non-immigrant visa for business visitors. Defendant Lowe, the Managing Director of Productos who carried on most of the negotiations with plaintiff, is a citizen and resident of Mexico. His involvement with this country is limited to serving as a director of Alameda Laboratories, Inc. He also holds a California driver's license. All of the parties to this case are, therefore, foreign citizens or foreign corporations.

Negotiations for the sale of Productos were initiated when Lowe approached Grunenthal in Germany in 1979. At this initial meeting, Lowe told plaintiff's representatives that Hotz controlled Productos and that he was willing to sell the company subject to certain conditions that would be discussed at a later meeting. Grunenthal's general counsel met with representatives of the Bahamian trust in the Bahamas in January 1980 to discuss the mechanics of the proposed purchase. At that meeting he was told that "there would not be any problem" in purchasing the shares of Productos. He then met with Lowe in Productos' offices in Mexico to further discuss the sale. Finally, he, other representatives of Grunenthal and Lowe flew together to Los Angeles to meet with Hotz. During the course of this flight further negotiations took place. At the Los Angeles meeting, Lowe again represented that Hotz controlled Productos, which Hotz did not disaffirm.

Hotz and Grunenthal signed the agreement in question in Los Angeles. Plaintiff claims that the agreement was a binding agreement to sell all of the common stock of Productos. Defendants claim that the agreement was contingent upon the approval of the Bahamian trustees. The closing was to take place in the Bahamas. The trustees refused to approve the sale, according to plaintiff, on Lowe's instructions because a higher offer for Productos subsequently had been made by a third party. Plaintiff then filed this action.

Plaintiff's second amended complaint for securities fraud alleges two claims for relief. The first claim alleges that at the Los Angeles meeting, defendant Hotz falsely represented to Grunenthal that he was the beneficial owner of Productos, that he controlled Productos and that he had the power and authority to cause all of the shares of Productos to be transferred to Grunenthal pursuant to the agreement. The second claim alleges that at the time the agreement was executed in Los Angeles, defendants Hotz and Lowe falsely represented that they had the unqualified intention to perform the agreement. It is alleged that these false representations violated Sections 12(2) and 17(a) of the Securities Act of

---

**2.** On a motion to dismiss for lack of subject matter jurisdiction, unlike a motion to dismiss for failure to state a claim upon which relief can be granted, the Court is neither confined to the allegations of the complaint nor need it accept such allegations as true. *Land v. Dollar*, 330 U.S. 731, 735 & n.4, 67 S.Ct. 1009, 1010, 1011, 91 L.Ed. 1209 (1947); *Thornhill Publishing Co. v. General Tel. & Elec. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979). All of the parties agree that the Court can consider all of the facts before it in determining whether or not it has subject matter jurisdiction. The facts summarized here, therefore, include all pertinent facts before the Court, including affidavits and depositions. However, to the extent not controverted by other evidence, the allegations of the Second Amended Complaint have been accepted as true for purposes of this motion. The recitation of such "facts" herein is not intended as a finding on the merits, particularly since the dismissal of this action will be without prejudice.

1933, 15 U.S.C. §§ 77*l*(2) & 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).

■ Defendants have moved to dismiss this action for lack of subject matter jurisdiction.[3]

*Discussion*

The motion is predicated on defendants' position that the aborted transaction which is the subject matter of this action is, in substance, a completely extraterritorial transaction involving the sale of a foreign corporation between parties, all of whom are foreign nationals or corporations. Little guidance is available from this circuit on the question of the limits of the extraterritorial reach of the United States securities laws and there is no controlling precedent. Lacking such precedent, we must turn elsewhere for guidance.

The doctrinal analysis is to approach the problem in terms of "conduct" or "effects," with respect to the state whose laws are sought to be applied to a transaction having substantial extraterritorial aspects. These two rules are set forth in Sections 17 and 18, respectively, of the Restatement (Second) of Foreign Relations Law of the United States (hereinafter cited as the "Restatement").[4]

*Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir.), *rev'd on other grounds*, 405 F.2d 215 (2d Cir. 1968) (*en banc*), *cert. denied sub nom. Manley v. Schoenbaum*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), follows the Restatement's analysis, although not placing express reliance on the Restatement. That case involved sales of securities which took place in Canada between foreign buyers and sellers. The court first found that Congress intended the securities laws to have extraterritorial application where necessary "to protect the domestic securities market from the effects of improper foreign transactions in American securities." *Id.* at 206. It then held, in accord with the "effects" test of Restatement § 18, that subject matter jurisdiction existed with respect to such extraterritorial transactions which "are detrimental to the interests of American investors." *Id.* at 208.

On its next occasion to address this question, the Second Circuit applied a combination of the conduct-effects test. *Leasco*

---

**3.** Defendants have also moved to dismiss for lack of personal jurisdiction and for failure to state a claim on which relief can be granted. These motions were denied, except that the motions to dismiss for failure to state a claim under Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), were granted. All pendent state claims were also dismissed. Defendant Hotz also had previously moved to dismiss for lack of subject matter jurisdiction. That motion was denied on April 18, 1980. The memorandum opinion on that motion which was subsequently filed, however, clearly indicated that the only factual matter considered on the motion was the complaint, the allegations of which were accepted as true. Defendant Hotz has now joined in the motion to dismiss for lack of subject matter jurisdiction filed by the later-served defendants. Thus, Hotz is essentially moving for reconsideration of the previous denial of his motion. Reconsideration appears to be proper because the matter is now before the Court in a different factual posture (*see* footnote 2, *supra*) and because, under Rule 12(h)(3), Fed.R.Civ.P., subject matter jurisdiction remains under continual scrutiny. *See Leasco, supra*, 468 F.2d at 1330 (issue of subject matter jurisdiction persists to trial).

**4.** Restatement § 17 provides:
 "A state has jurisdiction to prescribe a rule of law
 "(a) attaching legal consequences to conduct that occurs within its territory, whether or not such consequences are determined by the effects of the conduct outside the territory, and
 "(b) relating to a thing located, or a status or other interest localized, in its territory."
Restatement § 18 provides:
 "A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either
 "(a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or
 "(b) (i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems."

*Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir. 1972), was a suit by an American corporation (and its Netherlands Antilles alter ego) against a group of British subjects. Certain representations were made in the plaintiff's New York offices; others were made on the telephone between London and New York. An agreement between plaintiff and defendants was allegedly signed in New York, although the transaction was to be closed in London. The court, in holding that subject matter jurisdiction existed, highlighted several factors which plaintiffs assert are found in the instant case as well, particularly the fact that the agreement signed in the United States was "an essential link" in inducing further actions by Leasco. The importance of in-state conduct, however, was limited to the preliminary determination by the court that because of such conduct foreign relations law did "not preclude our reading § 10(b) as applicable here." *Id.* at 1335. Thus, although defendants' conduct in the United States was admittedly an important factor in the court's conclusion that the exercise of subject matter jurisdiction was appropriate, given the fact that plaintiffs there were American citizens and given the assumption in Judge Friendly's hypothetical situation of fraudulent conduct occurring in New York, *id.* at 1338, the effect of the transaction on American citizens was, undoubtedly, an important jurisdictional fact in *Leasco.*[5]

The Second Circuit again addressed this issue in *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir.), *cert. denied sub nom. Bersch v. Arthur Andersen & Co.,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975), and *IIT v. Vencap, Ltd.,* 519 F.2d 1001 (2d Cir. 1975).

*Bersch* concerned a claim of fraud in connection with the distribution of foreign securities. The vast majority of these securities were distributed to foreign citizens and none were listed on any American exchange; a few, however, found their way into American hands, both here and abroad. The conduct that allegedly took place in this country involved activities by underwriters and accountants. Defendants contended that the work done in New York "was mostly preliminary or ancillary to the work done in Europe, that all final action was taken there, and that there was no distribution of prospectuses or other promotional literature to purchasers within the United States—therefore that any fraudulent misrepresentations were neither made nor relied on in the United States." *Id.* at 985 n.24. Finding that, unlike the situation in *Leasco,* not even "a substantial part" of the misrepresentations were communicated in this country, the court held that there was no reason to extend jurisdiction "to cases where the United States activities are merely preparatory or take the form of culpable nonfeasance and are relatively small in comparison to those abroad." *Id.* at 987. In summarizing, the court stated that, as a rule, the anti-fraud provisions of the federal securities laws do not apply to losses from sales of securities to foreigners outside the United States unless acts (or culpable failures to act) within the United States directly caused such losses. This, of course, is an application of the conduct test of Restatement § 17, based on the court's conclusion that "the action and inaction which here occurred in the United States would not itself confer subject matter jurisdiction with respect to foreign plaintiffs . . . ." *Id.* at 987. The court then went on to hold that jurisdiction existed with respect to Americans residing in the United States, relying expressly on Restatement § 18.[6] *Id.* at 990–91. At the same time, the court indicated that the situation where losses are caused to foreigners from sales

---

**5.** That both effects and conduct were critical to jurisdiction in that case is indicated by the court's comment that "we think it tips the scales in favor of applicability when substantial misrepresentations were made in the United States." *Id.* at 1339. Conversely, it may be inferred that conduct alone would not have been sufficient in that case to "tip the scales" in favor of the assertion of jurisdiction.

**6.** With respect to the claims of Americans residing abroad, the court applied the conduct-effects test and held that subject matter jurisdiction existed on the record there. *Id.* at 992–93.

within the United States was not before the court. *Id.* at 993.

That situation was presented in *Bersch*'s companion case, *IIT v. Vencap, Ltd., supra,* 519 F.2d 1001. *Vencap* involved a suit by a Luxembourg investment trust against a Bahamian corporation and certain individuals, some of them Americans. The court again focused on the conduct that had taken place in this country.

> "We do not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security devices for export, even when these are peddled only to foreigners."

*Id.* at 1017. The court, however, also emphasized that, somewhere, there is an outer limit.

> "[T]he line has to be drawn somewhere if the securities laws are not to apply in every instance where something has happened in the United States, however large the gap between the something and a consummated fraud and however negligible the effect in the United States or on its citizens."

*Id.* at 1018.

In its most recent decision, *IIT v. Cornfeld,* 619 F.2d 909 (2d Cir. 1980), the Second Circuit reiterated its case-by-case approach to the question of jurisdiction over transnational fraud, emphasizing that neither the conduct nor the effects test was necessarily dispositive.

> "[W]e do not mean to suggest that either the American nationality of the issuer or consummation of the transaction in the United States is either a necessary or a sufficient factor, but, rather that the presence of both these factors points strongly toward applying the anti-fraud provisions of our securities laws.

$\qquad$ * $\qquad$ * $\qquad$ * $\qquad$ * $\qquad$ * $\qquad$ *

"Determination whether American activities 'directly' caused losses to foreigners depends not only on how much was done in the United States but also on how much (here how little) was done abroad."

*Id.* at 918, 920–21 (citation and footnote omitted).

As indicated earlier, there is no controlling Ninth Circuit precedent. However, such expression as we do have from this Circuit indicates that its analysis of this question would parallel that of the Second Circuit, as summarized in these cases.

On the few occasions when it has addressed the question, the Ninth Circuit also, although not expressly, has applied the Restatement's conduct-effects analysis. In *SEC v. United Financial Group, Inc.,* 474 F.2d 354 (9th Cir. 1973), the court first observed that the "focus should be upon appellants' activities within the United States and the impact of those activities upon American investors." It then concluded that a showing had been made of "very substantial activities ... within the United States," resulting in impact or effect on American investors. The court held that this showing was sufficient to sustain subject matter jurisdiction under both the Securities Act of 1933 and the Securities Exchange Act of 1934. *Id.* at 356–57. In *Des Brisay v. Goldfield Corp.,* 549 F.2d 133 (9th Cir. 1977), the court again held that jurisdiction existed over a claim arising out of an allegedly fraudulent extraterritorial stock transaction which resulted in "an adverse impact on domestic securities markets." *Id.* at 134.[7]

Upon the basis of the framework established by the foregoing discussion, then, we analyze the facts in this case. That analy-

---

7. *See also, Timberlane Lumber Co. v. Bank of America, N.T. & S.A.,* 549 F.2d 597 (9th Cir. 1976), which involved the question of the extraterritorial reach of the antitrust laws. The court there rejected the effects test as "by itself ... incomplete because it fails to consider other nation's interests." *Id.* at 611–12. It then adopted a "tripartite analysis" of effect on commerce, cognizable injury and a balancing of this country's interest against the interest of

other nations. *Id.* at 613 & 615. The third element of this test would appear to be peculiar to antitrust and trade regulation. *Id.* at 614 n.32. *Cf. Vencap, supra,* 519 F.2d at 1015 ("every civilized nation doubtless has this [prohibition against fraud] as a part of its legal system"). However, with respect to the other elements to be weighed, the analysis herein is wholly consistent with *Timberlane.* 549 F.2d at 614 & n.31.

sis is brief because the facts are not complicated.

 Plaintiff and all defendants are foreign nationals or corporations. The securities which are the subject matter of this transaction are foreign and are privately-held and not traded on any exchange. The course of conduct which culminated in execution of the agreement in Los Angeles involved conduct in three countries, other than the United States, and the importance of the conduct in each of those countries was at least equal to the conduct in this country. The only factual misrepresentation alleged to have been made in the United States was a repetition of representations first made abroad. Thus, it appears that the fact that the transaction was concluded here and, therefore, that the misrepresentation was repeated here, was only for convenience, i. e., that defendant Hotz happened to be here on a temporary visa.

We hold, on these facts, that no subject matter jurisdiction exists; that neither the Securities Act of 1933 nor the Securities Exchange Act of 1934 applies to a transaction in foreign securities between foreign nationals and corporations which has no effect on any American investors or securities market and in which the only nexus with the United States is conduct in this country based on convenience and the only local act of fraud alleged is a mere repetition of misrepresentations first spoken abroad and, thus, not essential to the consummation of the fraud.[8]

In reaching this conclusion, we recognize that the Eighth Circuit has adopted a more liberal approach to the assertion of jurisdiction in transnational securities fraud cases. In *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.*, 592 F.2d 409 (8th Cir. 1979), a case involving "a substantially foreign transaction, little if any domestic impact, and domestic conduct which consisted for the most part of use of the mail and telephones," *id.* at 421, the Eighth Circuit held that subject matter jurisdiction was appropriate where "some activity designed to further a fraudulent scheme occurs within this country." *Id.* at 418–19.[9] Were we to follow *Continental Grain*, it would probably justify the existence of subject matter jurisdiction in this case.[10] We believe, however, that the line of cases from the Second Circuit is more in keeping with the expressions of the Ninth Circuit in *United Financial, supra*, and *Timberlane, supra*; therefore, that the assertion of subject matter jurisdiction here would be inappropriate.

*Order*

IT IS ORDERED that the action is dismissed without prejudice for lack of subject matter jurisdiction.

8. The second claim for securities fraud herein alleges misrepresentation of defendants' state of mind—that they had no present intent to perform the agreement at the time it was executed in Los Angeles. Assuming such misrepresentation, or deceit, is actionable under the anti-fraud provisions of the securities laws, like the allegation of knowledge of cover-up of securities fraud, in a securities transaction which is otherwise nearly exclusively foreign, such in-state conduct is insufficient for the assertion of subject matter jurisdiction. *Fidenas AG v. Compagnie Internationale Pour L'Informatique CII Honeywell Bull S.A.*, 606 F.2d 5, 8 (2d Cir. 1979).

9. *See also, SEC v. Kasser*, 548 F.2d 109 (3d Cir.), *cert. denied sub nom. Churchill Forest Indus. (Manitoba) Ltd. v. SEC*, 431 U.S. 938, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977).

10. While *Continental Grain* acknowledges that the courts have generally applied the conduct-effects analysis in determining subject matter jurisdiction in transnational securities fraud cases, 592 F.2d at 415–16, it clearly extends jurisdiction to an area where it would not exist under that analysis.

"We frankly admit that the finding of subject matter jurisdiction in the present case is largely a policy decision. This is true to a certain degree in the other transnational securities cases. The present case, however, involves a substantially foreign transaction, little if any domestic impact, and domestic conduct which consisted for the most part of use of the mail and telephones. Nonetheless, we do not believe that our finding of jurisdiction is unwarranted nor, if such finding is an extension of previous cases, inconsistent with the principles outlined in those cases." *Id.* at 421. *See* Comment, *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.: An Unjustifiable Expansion of Subject Matter Jurisdiction in a Transnational Securities Fraud Case*, 2 Nw.J. Int'l L. & Bus. 264 (1980).